UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TAE YOUN SHIM, et al.,

           Plaintiffs,

    v.

MARTIN J. LAWLER, et al.,

           Defendants.

Case No. 17-cv-04920-EMC

**ORDER DENYING PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT AND GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Docket Nos. 61, 62, 89

Plaintiffs Ji Taek Kim ("Kim"), Tae Youn Shim ("Shim"), and Hua Xue ("Xue") are foreign nationals who made substantial investments in a United States company, pursuant to the EB-5 Immigrant Investor Program, in order to become eligible for green cards. Plaintiffs each retained attorney Martin Lawler ("Lawler") and his law firm Lawler & Lawler (collectively, "Defendants") to guide them through the EB-5 application process. Although each Plaintiff ultimately obtained a green card, the company in which they invested fared poorly. Plaintiffs have now sued Defendants, alleging that Defendants violated their professional obligations and fiduciary duties by misleading Plaintiffs about the nature of their investments and representing other parties involved in the EB-5 program with interests adverse to Plaintiffs'.

Pending before the Court is Defendants' motion for summary judgment, Docket No. 61 ("Def. Mot."), and Plaintiffs' motion for partial summary judgment, Docket No. 62 ("Pl. Mot."). For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED** and Plaintiffs' motion for partial summary judgment is **DENIED**.

# I.    BACKGROUND

2    A.    The EB-5 Program

3        This case arises out of Defendants' alleged conduct in connection with the EB-5 Immigrant

4    Investor Program.  The EB-5 program affords certain foreign investors a path to becoming lawful

5    permanent residents ("LPRs") in the United States.  *See* 8 U.S.C. § 1153(b)(5).  Eligible investors

6    must show that they have invested or are in the process of investing a specified amount of capital

7    in a new commercial enterprise, and that their investment will create at least 10 jobs for United

8    States workers.  *Id.* § 1153(b)(5)(A).  Where the new commercial enterprise is based in a "targeted

9    employment area," investors must invest a minimum of $500,000 in the enterprise to qualify for

10    the program.  *Id.* § 1153(b)(5)(C).  The investment must be "at risk."  8 C.F.R. § 204.6(j)(3).  This

11    means "there must be a risk of loss and a chance for gain"; "[i]f the immigrant investor is

12    guaranteed a return, or a rate of return on all or a portion of his or her capital," the investment does

13    not meet EB-5 requirements.  U.S. Citizenship and Immigration Services, Policy Manual, Vol. 6,

14    Part G, Ch. 2, https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-1 (last visited July 5,

15    2019).

16        An EB-5 application passes through two stages.  First, the investor files a petition for EB-5

17    status (the "I-526 petition") with United States Citizenship and Immigration Services ("USCIS"),

18    "seeking approval of their submitted investment and business plans."  *Chang v. United States*, 327

19    F.3d 911, 916 (9th Cir. 2003).  If the I-526 petition is approved, the investor and his or her

20    dependents "may enter the country as conditional LPRs."  *Id.*  Second, between 21 and 24 months

21    after the I-526 petition, the investor must file a second petition (the "I-829 petition").  *Id.*  USCIS

22    approves the I-829 petition and grants unconditional LPR status if it finds that the investor made

23    no material misrepresentations in the I-526 petition and complied with the EB-5 program

24    requirements.  *Id.* (citing 8 C.F.R. §§ 204.6, 216.6).

25        There are two ways for EB-5 investors to invest in qualifying enterprises.  The first is to

26    invest directly in an enterprise that employs qualifying employees.  *See* U.S. Citizenship and

27    Immigration Services, *About the EB-5 Visa Classification*, https://www.uscis.gov/working-united-

28    states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/about-eb-5-visa-

United States District Court
Northern District of California

classification (last visited June 5, 2019). The second is to invest indirectly through "regional centers." *See id.* Regional centers are USCIS-approved entities that support economic growth in particular regions by coordinating investments in EB-5 enterprises. *See id.*; 8 C.F.R. § 204.6(e), (m)(2). Regional centers coordinate investors and allows them to pool their investments in qualifying enterprises. *See* U.S. Citizenship and Immigration Services, Policy Manual, Vol. 6, Part G, Ch. 1, https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-1 (last visited July 5, 2019). A regional center can direct investments into multiple EB-5 enterprises, and will typically set up a separate investment fund, or "Newly Created Entity," to accept investments in each enterprise. Docket No. 61-3 (Ahn Decl.) ¶ 12.

B.    The Parties and Relevant Entities

Defendant Lawler is an immigration attorney who has represented clients in connection with the EB-5 program since 1991. Docket No. 61-1 (Lawler Decl.) ¶ 3. He and his law firm, Lawler & Lawler, are the named defendants in this suit. *Id.* ¶ 1. Plaintiffs Shim, Xue, and Kim each retained Defendants to assist them in applying for EB-5 visas. *Id.* ¶ 18.

Simon Ahn, who is not a party to this action, is an investor and attorney who helped found the Green Detroit Regional Center ("GDRC") between 2009 and 2010 and was its CEO. Ahn Decl. ¶¶ 1–3. The purpose of GDRC was to bring in foreign investments through the EB-5 program and direct them to qualifying enterprises. *Id.* ¶ 3. To become a qualified EB-5 regional center, GDRC had to apply for and secure USCIS approval. *Id.* ¶ 4. GDRC retained Lawler "to file the original I-924 application [to become a qualified regional center] for GDRC and subsequent amendments." *Id.* ¶ 5. Lawler's "role was to provide legal services to GDRC to facilitate the process with USCIS for immigration matters dealing with GDRC relating to maintaining regional center status under the EB-5 program." *Id.* GDRC eventually obtained USCIS approval as an EB-5 regional center. Lawler Decl. ¶¶ 10–11. Ahn also set up SMS Investment Group, LLC ("SMS") as the "Newly Created Entity" to accept the EB-5 investments in ALTe. Ahn Decl. ¶ 12. Investors thus became limited partners in SMS, and their investments were directed ALTe. *Id.*

One enterprise in which SMS invested was ALTe LLC ("ALTe"), which "developed

electric powertrain systems for commercial vehicles." Lawler Decl. ¶ 10; Ahn Decl. ¶ 12. GDRC "worked with migration agents . . . to bring in potential foreign investors for ALTe."[1] Ahn Decl. ¶ 9. Each Plaintiff invested $500,000 in ALTe to qualify for the EB-5 program. Kim invested in ALTe directly, on or around August 16, 2010. Docket No. 63 (First Hinton Decl.), Exh. 4 (Lawler Deposition) at 91:1–8; *id.*, Exh. 5 (Subscription Agreement). Shim and Xue each invested in ALTe indirectly on or around July 5, 2010, via SMS. *See* Docket No. 70 (Second Hinton Decl.), Exh. 95 (Shim Deposition) at 34:5–10; *id.*, Exh. 96 (Xue Deposition) at 41:10–17. Each Plaintiff decided to invest in ALTe after consulting with their respective migration agents. *See* First Hinton Decl., Exh. 2 (Kim Deposition) at 37:23–25; Shim Deposition at 24:2–21; Xue Deposition at 22:2–12.

C.      Plaintiffs' EB-5 Applications

        Each Plaintiff retained Defendants as counsel in connection with his or her EB-5 application after making the decision to invest in ALTe. *See* Kim Deposition at 37:18–25; Shim Deposition at 39:16–21; Xue Deposition at 14:14–16. Kim retained Defendants in 2010. He was referred to Defendants by Kukje Immigration Development Corp. ("KIDC"), a South Korean migration agency. Lawler Decl. ¶ 22. The retainer agreement provided that Kim employed Defendants "as attorneys to represent me and my spouse and children under age 21 for permanent resident status in the United States via the EB-5 investor category." Docket No. 61-2 (Roeca Decl.), Exh. C. at 1. The agreement also provided that:

> Lawler & Lawler has not advised me to invest in any particular project. I understand I must conduct a due diligence analysis of any investment. Lawler & Lawler will provide no business advice. **I hereby hold Lawler & Lawler harmless from any loss I may incur in the investment I make for the EB-5 visa.**
>
> . . . .

---

[1] "Migration agencies" assist both business entities and investors within the EB-5 process. They "market or promote investment projects for regional centers" to foreign investors and are generally "paid fees by the regional centers or the regional center projects." Lawler Decl. ¶ 15. The migration agencies also "play a role as agents for the investor seeking an EB-5 visa," for example by providing translation services, helping the investor gather documents, and communicating with the investor's EB-5 attorney. *Id.* ¶ 14.

United States District Court
Northern District of California

> It is understood that Lawler & Lawler provides no business advice and has not and will not make recommendations for a business investment from an economic viewpoint, but only provides services for an EB-5 visa.

*Id.* at 1, 2 (emphasis in original).

Kim also signed a "waiver of conflict of interest [and] consent to joint representation." *Id.*, Exh. D. The waiver informed the investor that "Lawler & Lawler represents both the Green Detroit Regional Center and Ahn & Associates and SMS Investment Group, LLC . . . and the Investor in securing an immigrant visas [*sic*] for the Investor." *Id.* Kim's I-526 petition was approved on June 22, 2011, his conditional LPR status was approved on May 10, 2012, and his full LPR status was approved on November 14, 2016. Lawler Decl. ¶¶ 25, 31.

Shim retained Defendants in 2010. Lawler Decl. ¶ 22. She was referred to Defendants by KIDC. *Id.* Shim's retainer agreement contained the same express language limiting the scope of Defendants' representation to EB-5 immigration services only, the same as Kim's retainer agreement. *See* Roeca Decl., Exh. M; Shim Deposition at 47:15–50:4. Shim also signed the same waiver of conflict and consent to joint representation as Kim. *See* Roeca Decl., Exh. N; Shim Deposition at 50:8–21. Shim's I-526 petition was approved on July 27, 2011, her conditional LPR status was approved on April 3, 2012, and her full LPR status was approved on March 28, 2016. Lawler Decl. ¶¶ 26, 30.

Xue retained Defendants in 2011. Lawler Decl. ¶ 24. She was referred to Defendants by an attorney named Peter Jensen. *Id.* Xue's retainer agreement contained the same express language limiting the scope of Defendants' representation to EB-5 immigration services only as in Kim's retainer agreement. Roeca Decl., Exh. S. Xue also signed the same waiver of conflict and consent to joint representation as Kim. *Id.*, Exh. T. Xue's I-526 petition was approved on September 7, 2011 and her conditional LPR status was approved on May 22, 2012. Lawler Decl. ¶ 27. Xue did not retain Defendants to prepare her I-829 petition, but with the assistance of other counsel she also obtained full LPR status. *Id.* ¶ 29.

D.   Conversion of Kim's ALTe Investment

Kim entered into a Subscription Agreement with ALTe on August 16, 2010 pursuant to which he made a direct investment of $500,000 in ALTe. *See* First Hinton Decl., Exh. 5.

5

However, Kim asserts that "his direct holdings in ALTe would last but a week," because on August 23, 2010, his "direct equity interest in ALTe was eliminated" and converted into an indirect interest via SMS, such that his investment in ALTe was "held indirectly under the control of SMS." Pl. Mot. at 6. Kim claims that "[t]his conversion was done without [his] knowledge or authorization." *Id.*; *see* Kim Deposition at 84:3–14. However, a letter sent by GDRC to USCIS in support of Kim's I-829 petition states that "Mr. Kim elected to have SMS manage his shares." First Hinton Decl., Exh. 21 at 2.

On October 15, 2014, Lawler sent Kim an email notifying him of "problems pertaining to ALTe's job creation," which are discussed in more detail below. Lawler Decl., Exh. C. In the email, Lawler also reported that he was recently apprised of the conversion of Kim's interest in ALTe, and warned Kim that the conversion may have consequences for his EB-5 status:

> You transferred your EB-5 funds and filed your visa petition as a direct investor in ALTe. SMS recently notified me just prior to filing your I-829 petition that your ownership interest has been transferred from ALTe to SMS, and you became a limited partner in SMS, and therefore there are no records of your current ownership in ALTe. I was also notified that you no longer hold a position on the Advisory Board at ALTe. USCIS may challenge whether you have properly maintained your investment in ALTe as a direct investor. . . . It is unclear how this will affect you as a direct investor.

*Id.* Lawler concluded by informing Kim that his services were limited to immigration issues, and advised Kim to contact SMS or ALTe about his investment:

> As you know, I am only involved in the immigration visa matters, not the finance or business matters related to the Regional Center or it's [*sic*] projects. If you have any questions regarding the business aspects or job creation, I encourage you to contact Simon Ahn, the Principal of SMS Investment Group, LLC, or Darren Post, the CEO of ALTe Technologies, Inc. If you have any questions about the immigration implications, please let me know and I am happy to have a call.

*Id.*

On June 23, 2016, Lawler sent a letter to Kim reiterating his concerns that the conversion of Kim's interest in ALTe, among other issues, could jeopardize Kim's pending I-829 petition:

> You initially made your EB-5 investment directly in ALTe . . . .

> The I-526 petition was filed and approved based on this direct
> investment in ALTe. Your I-829 was also filed based on this direct
> investment.
>
> I have received some conflicting information about whether you
> have maintained your investment in ALTe. . . . I am unclear if you
> still hold an ownership interest in ALTe for your direct investment.
> I was informed much later that you and Simon Ahn entered into an
> arrangement where you were also accepted as a limited partner in
> SMS. I was not aware when this change transpired, and it was
> completed without my knowledge or legal advice.
>
> There is currently no accepted USCIS procedure for you to switch
> from a direct investor in ALTe to a Regional Center investor in SMS
> without filing a new I-526 petition. If you have failed to maintain
> your investment and interest in ALTe, and you are no longer serving
> in a management role with ALTe, your I-829 petition may be
> denied.

Lawler Decl., Exh. D at 1. Lawler also repeated his disclaimer that he was "only involved in the immigration visa matters, not the finance or business matters related to the Regional Center of its projects," and his recommendation that Kim should contact SMS or ALTe with any questions about the business aspects of his investment. *Id.* at 2.

E.      Problems at ALTe

GDRC produced materials promoting EB-5 investment in ALTe, including a document titled "United States EB-5 Immigrant Investor Program." First Hinton Decl., Exh. 10; *see also id.*, Exh. 11 (Chinese version of document), Exh. 12 (Korean version of document).[2] The document specifically targets investment in ALTe. *See id.* at 3–4 ("The EB-5 immigration program of Green Detroit Regional Center, LLC (SMS) will make investment in a company which provides various technologies for electric and hybrid electric powertrain conversions."). The document contains a number of statements touting ALTe, including:

- On the front cover, "Funds allocated by U.S. Department of Energy" is displayed in large text above logos for SMS and ALTe. *Id.* at 1.

- ALTe "has obtained direct support from high-ranking government officials in the United States, including the United States Secretary of Commerce, United States Secretary of Energy, governor of Michigan and several members of United States

---

[2] These documents are not dated, but appear to be from early 2010 because they reference events up until February 2010.

Congress." *Id.* at 3; *see id.* at 5 (listing specific government supporters).

- "Orders of 240,000,000 US dollars' value already received." *Id.* at 5.

- "The project does not rely on EB-5 investment because 80% of its capitals [sic] are

    from the Department of Energy of the federal government and the product orders it

    already confirmed." *Id.*

The reality turned out to be less rosy. Theodore Oshman, an ALTe investor and board

member who is not a party to this suit, recounted that ALTe sought a loan from the Department of

Energy ("DOE") but was unsuccessful. First Hinton Decl., Exh. 13 at 51:24–52:2 ("Q. So

ultimately the Department of Energy did not provide a loan to ALTe?" A. Correct, they ultimately

did not."). The only sale ALTe made was for one prototype truck to Southern California Edison.

*See id.* at 70:9–16.

Lawler's October 15, 2014 email to Kim stated that "[t]here are problems pertaining to

ALTe's job creation." Lawler Decl., Exh. C. The email explained that in the course of preparing

responses to a Request for Evidence issued by USCIS to several investors with pending I-829

petitions, Lawler

> was informed by [GDRC] and ALTe executives that due to various
> business issues, ALTe has not been able to create the number of jobs
> they originally expected. Over the years the company has hired
> many employees, but many of these jobs had to be laid off last year.
> We do not know if USCIS will accept these jobs for the EB-5 job
> creation requirement because they were laid off.

> . . . .

> It is possible that USCIS may allow SMS to show more jobs will be
> created within a year. I am told ALTe is working on several new
> business deals that they believe will create new jobs again.

*Id.*

Eventually, ALTe ceased operations. According to Ahn, "ALTe came to the point where it

was better to focus on manufacturing energy storage units." Ahn Decl. ¶ 13. ALTe thus

"[m]orph[ed]" into a company named eMatrix. Def. Mot. at 16. Ahn represents that he

"negotiated that the EB-5 investors [in ALTe] would retain their same interest in eMatrix of

approximately 29 percent (the percentage they had held in ALTe)" after the transition. Ahn Decl.

¶ 13.  It appears that eMatix is still an active company, and "SMS investors got the same shares in eMatrix as they had in ALTe in the beginning."  *Id.* ¶ 14.

## II. <u>DISCUSSION</u>

A.  <u>Legal Standard</u>

Federal Rule of Civil Procedure 56 provides that summary judgment shall be rendered on a claim or defense, or part of a claim or defense, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party.  *Id.*  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.  On a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor.  *Id.* at 255.

The party moving for summary judgment always bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the movant also bears the ultimate burden of proof at trial, it can meet this initial burden of production by "com[ing] forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  This requires the movant to affirmatively demonstrate that there is no genuine dispute as to every essential element of its claim.  *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992).  In contrast, where the movant does not bear the ultimate burden of proof, it can meet its initial burden by demonstrating the non-moving party's failure "to make a showing sufficient to establish the existence of an element essential to [the non-moving party's] case."  *Celotex*, 477 U.S. at 322.  Once the movant meets its initial burden of production, the burden shifts to the non-moving party to "produce evidence to support its claim or defense."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).  "If the nonmoving party fails to produce enough

9

evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 322). Conversely, if the nonmoving party "produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id.*

In resolving a summary judgment motion, the court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment"; it is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted).

B.  <u>Motions to Strike</u>

1.  <u>Defendants' Motion to Strike Plaintiffs' Exhibits</u>

Defendants ask the Court to strike many of the exhibits Plaintiffs submitted in support of Plaintiffs' motion for summary judgment, on two grounds. First, Defendants argue that Plaintiffs' documentary evidence, which is attached as exhibits to the declaration of Plaintiffs' counsel Christopher Hinton, lacks proper authentication under Federal Rule of Evidence 901. Docket No. 69 ("Def. Opp.") at 14. Hinton's declaration states that he has "personal knowledge of all the matters stated in this declaration" and that each exhibit is "true and correct." First Hinton Decl. ¶ 3. However, as Defendants point out, Hinton was "not himself a party to the underlying events giving rise to this action, and thus lacks any personal knowledge" that could form a valid basis for authenticating many of the exhibits, such as paperwork submitted in connection with Plaintiffs' EB-5 applications. Def. Opp. at 14.

Rule 56(c)(4) requires that a "declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Defendants are correct that a "declarant's mere assertions that he or she possesses personal knowledge and competency to testify are not sufficient." *Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1023 (N.D. Cal. 2006) (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)). Rather, the "declarant must show personal knowledge and competency 'affirmatively,' . . . for example, by 'the nature of the declarant's position and nature of

1  participation in [the] matter.'" *Id.* (citing *Barthelemy*, 897 F.2d at 1018).

2          However, "the focus of an objection at the summary judgment stage is not 'the

3  admissibility of the evidence's form' but on the 'admissibility of its contents.'"  *Dillon v. Cont'l*

4  *Cas. Co.*, 278 F. Supp. 3d 1132, 1137 (N.D. Cal. 2017) (quoting *Fraser v. Goodale*, 342 F.3d

5  1032, 1036 (9th Cir. 2003)).  Evidence should be stricken only if it "cannot be presented in a form

6  that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Thus, materials that "would

7  likely be authenticated and admissible at trial via the testimony of the out of court declarants" can

8  be considered on a motion for summary judgment.  *Sun Microsystems Inc. v. Hynix Semiconductor*

9  *Inc.*, 622 F. Supp. 2d 890, 905 (N.D. Cal. 2009); *see Fraser*, 342 F.3d at 1036–37 (permitting

10  consideration of plaintiff's diary on summary judgment without regard to "whether the diary itself

11  is admissible" because the "contents of the diary [we]re mere recitations of events within

12  [plaintiff]'s personal knowledge and, depending on the circumstances, could be admitted into

13  evidence at trial in a variety of ways"); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*,

14  No. 14-CV-04050-MEJ, 2017 WL 3453337, at *3 (N.D. Cal. Aug. 11, 2017) (denying motion to

15  strike on authentication grounds where the party "may be able to call at trial a witness who can

16  testify to his or her personal knowledge of the assertions" in the challenged materials).  Here,

17  Plaintiffs have listed specific individuals with personal knowledge of the events discussed in the

18  challenged exhibits who would be able to authenticate them at trial.  *See* Docket No. 78 at 11–12.

19  Accordingly, Defendants' motion to strike these exhibits is **DENIED**.

20          Second, Defendants move to strike certain exhibits as inadmissible hearsay.  However,

21  they do not detail their objections; they simply cite a list of exhibits and assert that they are

22  "hearsay."  Def. Opp. at 14.  Hearsay objections are necessarily context-bound, so litigants must

23  object to particular statements or portions of exhibits and explain the basis for each objection.  *See*

24  *Kerr v. City & Cty. of San Francisco*, No. C 10-5733 CW, 2012 WL 3877752, at *7 (N.D. Cal.

25  Sept. 6, 2012); *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1122–24 (E.D. Cal.

26  2006).  Accordingly, Defendants' vague hearsay objections are **DENIED**.

27          Defendants also ask the Court to strike many exhibits Plaintiffs submitted with their

28  opposition to Defendants' motion for summary judgment.  Some of Defendants' objections are

11

United States District Court
Northern District of California

made on the same authentication and hearsay grounds as discussed above, and are **DENIED** for the same reasons—the challenged exhibits could be authenticated at trial by individuals with personal knowledge of their contents, and Defendants' hearsay objections are asserted conclusorily. *See* Docket No. 77 at 6–7.

The remaining objection is to reports submitted by Plaintiffs' experts, Jean Cha (regarding breaches of fiduciary duty and an attorney's duty of care) and Sanjay Pansari (regarding damages). *Id.* at 7–8. Defendants object to the Cha reports on the grounds that they do not attach the materials relied upon and that "the author states no qualifications whatsoever for rendering any opinion as to the standard of care of an immigration lawyer handling EB-5 visa applications." *Id.* at 8 n.6. As to the first objection, the relevant materials are included elsewhere in the record. As to the second, Cha has stated her qualifications as an expert "in the area of Professional Responsibility and ethical concerns relating to Rules of Professional Conduct and the State Bar Act violations in California." Docket No. 80, Exh. 1 ("Cha Expert Report") at 3. A witness can qualify as an expert on the basis of "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and such qualifications are construed broadly, *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994). An objection like Defendants' concerning a "lack of particularized expertise goes to the weight accorded [to the expert's] testimony, not to the admissibility of her opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993). Defendants have not shown the Cha report should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants' motion to strike Cha's reports is thus **DENIED**.

Pansari's reports are not necessary for the resolution of this motion. Defendants' motion to strike his reports is therefore **DENIED as moot**.

2.    Plaintiffs' Submission of New Evidence in Reply Brief and Post-Hearing Letter

With the reply brief filed in support of their motion for partial summary judgment, Plaintiffs submitted fifteen exhibits. *See* Docket No. 79. While two of these exhibits appear to be duplicates of evidence already in the record (Exhibits 6 and 9), the remainder consist of new evidence that Plaintiffs did not file with their initial motion. "It is well accepted that . . . [the]

submission of new facts in [a] reply brief is improper." *Pajas v. Cty. of Monterey*, No. 16CV00945BLFSVK, 2017 WL 1408016, at *7 (N.D. Cal. Apr. 20, 2017) (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.")). The Court therefore **STRIKES** these new exhibits. *See Rodgers v. Chevys Restaurants, LLC*, No. C13-03923 HRL, 2015 WL 909763, at *5 (N.D. Cal. Feb. 24, 2015) ("A court may strike new evidence raised for the first time in a reply.") (citation omitted).

At the close of the summary judgment hearing, the Court gave an opportunity to Plaintiffs' counsel, Christopher Hinton, to submit a letter with citations to the existing record that substantiate factual assertions he made during the hearing and in his briefs. *See* Docket No. 82. Instead of submitting the list of citations ordered by the Court, however, Mr. Hinton filed a 5-page letter containing additional argument and attaching two new exhibits and three new declarations from Plaintiffs. *See* Docket No. 83. These new evidentiary submissions are not responsive to the Court's order. The Court therefore **STRIKES** the exhibits and declarations.

### 3. Plaintiffs' Motion to Strike Defendants' Motion for Summary Judgment

The conduct of Plaintiffs' counsel in this case has been erratic and often problematic. Among other things, they have filed an overlength brief in opposition to Defendants' motion for summary judgment, in violation of Civil Local Rule 7-4(b); filed a brief without a statement of issues to be decided, a table of contents, or a table of authorities, in violation of Civil Local Rule 7-4(a)(2)–(3); submitted briefs littered with factual assertions either accompanied by no citations to supporting evidence at all[3] or citations that are indecipherable[4]; and blatantly mischaracterized

---

[3] For example, Plaintiffs assert, without citation, that "Ms. Shim's funds [purportedly invested in ALTe through SMS] were to be used to pay principle and client of Defendants without her knowledge or consent," Pl. Opp. at 7; "Defendants were privy to all of this information [about problems at ALTe] given their role as counsel to the various entities," *id.* at 9; and "Defendants, without authorization or contract, wholly relied upon [migration agents] to essentially act as Plaintiffs attorneys," *id.* at 12.

[4] For example, in the span of two paragraphs in one brief, Plaintiffs' counsel cites an unspecified "Email," an "Email Kim direct v Indirect," and the "Ahn Deposition," a transcript running over

the record.[5]  When the Court gave Plaintiffs' counsel an opportunity to submit a short letter after the hearing providing citations to the existing record that support counsel's factual assertions, counsel instead filed a 5-page submission containing additional argument and attaching yet *more* new evidence—after having already improperly submitted new evidence with Plaintiffs' reply brief.  *See* Docket No. 83.  As the icing on the cake, Plaintiffs' counsel did not show up to the summary judgment hearing.  Counsel provided no explanation for their no-show; Mr. Hinton simply stated that he was not aware of the hearing, even though it had been continued from its originally scheduled date at *his* request.  *See* Docket No. 57.  The Court was only able to hold the hearing once it tracked down counsel by phone.

And yet, overlooking their own litany of gaffes, Plaintiffs' counsel insist that it is Defendants' counsel that have committed an "incurable" mistake by filing a proposed order one day after they filed their summary judgment motion, rather than concurrently.  Docket No. 89 at 2.  On this basis, Plaintiffs ask the Court to strike Defendants' motion in its entirety.  *Id.*  However, Plaintiffs cite no authority for the proposition that a one-day delay in the filing of a proposed order is grounds for striking a motion, nor identify any prejudice they have suffered as a result of Defendants' late filing.  Instead, Plaintiffs reference a case in which a summary judgment motion was stricken because the motion itself was filed almost a full year late.  *See U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1104 (9th Cir. 1985), *superseded by statute on other grounds as recognized in Simpson v. Lear Astronics Corp.*, 77 F.3d 1170 (9th Cir. 1996).  Plaintiffs' motion to strike is **DENIED**.

C.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Plaintiffs' claims: (1) legal malpractice;

---

200 pages, without a page cite.  Pl. Opp. at 3–4.

[5] For example, Plaintiffs purport that "Defendant admits, buried in a footnote, he never spoke to any of the Plaintiffs at such a point [prior to their EB-5 interviews]."  Pl. Opp. at 12.  Plaintiffs cite to footnote 3 of Defendants' motion as the source of this admission.  But that footnote expressly states (supported by citations to the record) the opposite: that Kim "spoke with [Lawler] once, before his embassy interview," and that Shim likewise "spoke with Lawler once, in preparation for her consular interview."  Def. Mot. at 7 n.3.

(2) breach of fiduciary duty; (3) fraud and deceit; (4) fraudulent concealment; (5) deceit in violation of California Civil Code § 1709, *et seq.*; (6) liability for securities violations under California Corporations Code § 25504, *et seq.*; (7) negligent misrepresentation; (8) civil conspiracy; (9) unfair business practices in violation of California Business & Professions Code § 17200, *et seq.*; and (10) unjust enrichment.  Docket No. 18 ("Am. Compl.") ¶¶ 54–113.

### 1.  Legal Malpractice

Plaintiffs' first cause of action is legal malpractice.  They allege that Defendants are admitted to practice law in California and violated California laws and rules governing attorney conduct.  Am. Compl. ¶¶ 10–11, 42; *see Pree v. Backus*, 12 F.3d 1108 (9th Cir. 1993) ("[L]egal malpractice is a state law cause of action.").  Under California law, "[t]he failure to provide competent representation in a civil . . . case may be the basis for civil liability under a theory of professional negligence." *Coscia v. McKenna & Cuneo*, 25 Cal. 4th 1194, 1199 (2001).  "In a legal malpractice action arising from a civil proceeding, the elements are (1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence." *Id.*

Plaintiffs' legal malpractice claim centers on Defendants' failure to properly inform them about the financial condition of ALTe, which "resulted in the total loss of [Plaintiffs'] investment capital."  Compl. ¶¶ 55–56.  But because Plaintiffs have failed to establish a genuine dispute as to whether Defendants owed them a duty to render business and investment advice, their legal malpractice claim fails.  Shim's claim fails for the additional reason that she cannot establish causation.

### a.  Duty

Defendants contend the scope of their professional duty to Plaintiffs was limited to the immigration matters relating to Plaintiffs' EB-5 applications, and excluded the business aspects of Plaintiffs' investments.  Defendants point to the retainer agreements they entered into with Plaintiffs, which expressly defined the scope of representation as excluding business and

investment counseling:

> Lawler & Lawler has not advised me to invest in any particular
> project.  I understand I must conduct a due diligence analysis of any
> investment.  Lawler & Lawler will provide no business advice.  **I
> hereby hold Lawler & Lawler harmless from any loss I may
> incur in the investment I make for the EB-5 visa.**
>
> . . . .
>
> It is understood that Lawler & Lawler provides no business advice
> and has not and will not make recommendations for a business
> investment from an economic viewpoint, but only provides services
> for an EB-5 visa.

Roeca Decl., Exh. C. at 1, 2 (emphasis in original).

"The question of the existence of a legal duty of care in a given factual situation presents a question of law which is to be determined by the courts alone."  *Nichols v. Keller*, 15 Cal. App. 4th 1672, 1682 (1993).  "[T]he extent of an attorney's duty to act necessarily depends on the scope of the attorney-client relationship, and the scope of this relationship may be limited by the agreement between the attorney and the client."  *Janik v. Rudy, Exelrod & Zieff*, 119 Cal. App. 4th 930, 940 (2004) (citations omitted).  The clear language of the retainer agreements above undermines Plaintiffs' assertion that Defendants owed a duty of care as a "broker-dealer" to render financial advice.  Indeed, Defendants' expert, Carolyn Lee, opines that "any communication with a client about the financial or investment status of the [ALTe] Project would be inconsistent with the scope of engagement, expressly outside the [Retainer] Agreement, and contrary to ethical standards governing competence."[6]  Second Hinton Decl., Exh. 94 at 9–10.

Plaintiffs offer several responses.  First, as a threshold matter, Plaintiffs challenge the

---

[6] Plaintiffs' expert Jean Cha disagrees with Lee's conclusions, and argues that Lawler "should have provided the information [to Plaintiffs about ALTe's financial condition] with instruction to investigate whether it impacted the clients' position."  Docket No. 80-2 at 16.  But Cha's analysis relies on assumptions contradicted by the record.  Cha asserts that "in some situations, Lawler did *presumably* provide financial advice, especially in the outset during the hiring process and through solicitation, advertising, or marketing materials."  *Id.*  However, as discussed in this section, the undisputed evidence establishes that Lawler provided no financial advice to Plaintiffs about their investments and was not involved in the marketing or solicitation of investments by GDRC.  In any event, as detailed below, Lawler *did* encourage Plaintiffs to further investigate ALTe's struggles.

16

validity of the retainer agreements under California Civil Code § 1632(b)(5) and California

Business and Professions Code § 6154.  Docket No. 71 ("Pl. Opp.") at 17.  Neither statute helps

Plaintiffs.  Section 1632 requires "[a]ny person engaged in a trade or business who negotiates

primarily in Spanish, Chinese, Tagalog, Vietnamese, or Korean, orally or in writing, in the course

of entering into any of the [enumerated types of contracts], shall deliver to the other party to the

contract or agreement and prior to the execution thereof, a translation of the contract or agreement

in the language in which the contract or agreement was negotiated." Cal. Civ. Code § 1632(b).

Plaintiffs cite no evidence that Lawler or his firm "negotiates primarily in Spanish, Chinese,

Tagalog, Vietnamese, or Korean." *See Lopez v. Asbury Fresno Imports, LLC*, 234 Cal. App. 4th

71, 77 (2015) (holding that § 1632 was not violated where evidence showed "Defendant did not

primarily negotiate the sale of the vehicle to plaintiffs in Spanish," but rather that "the parties

primarily communicated using English").

Section 6154 provides that "[a]ny contract for professional services secured by any

attorney at law or law firm in this state through the services of a runner or capper is void." Cal.

Bus. & Prof. Code § 6154(a).  "A runner or capper is any person, firm, association or corporation

acting for consideration in any manner or in any capacity as an agent for an attorney at law or law

firm, whether the attorney or any member of the law firm is admitted in California or any other

jurisdiction, in the solicitation or procurement of business for the attorney at law or law firm as

provided in this article." *Id.* § 6151.  Plaintiffs allege that migration agencies acted as runners or

cappers for Lawler and his firm. *See* Pl. Opp. at 17.  However, Plaintiffs immediately contradict

their own claim; they reveal that the migration agents acted as recruiters for GDRC, not

Defendants: "These foreign agencies were compensated for such procurement via commissions

*paid by GDRC* who, unbeknownst to Plaintiffs, used a significant portion of each of Plaintiffs'

$30,000 'management fees' *paid to GDRC* for such commissions." *Id.* (emphases added).

The evidence Plaintiffs cite confirms that GDRC paid migration agents a fee for referring

foreign nationals to invest in GDRC, separate from any transactions involving Defendants. *See*

Lawler Deposition at 45:15–24 ("Q. Do foreign agencies market or promote investment projects

for regional center? A. Yes, they do.  That is common and not necessarily one, sometimes

17

multiple, different projects.  Q. Do you know how migration agents are compensated for the promotion of such projects?  A. Generally speaking, they are paid fees by the regional centers or the regional center projects."); Second Hinton Decl., Exh. 97 (Ahn Deposition) at 32:10–19 ("Q. Did the EB-5 investors, any of their contributions go towards the funding of Green Detroit? . . . . A. So the way it works in the EB-5 world everybody knows, is the processing fee that the regional center gets . . . that goes all to the brokers outside the U.S. for commission.").  Nowhere do Plaintiffs identify evidence that *Defendants* paid migration agents to solicit clients for *Defendants* in violation of § 6154.  *See* Lawler Decl. ¶ 49 ("At no time did I or my firm ever share the legal fees we earned as plaintiffs' immigration counsel with any other parties.").  The retainer agreements are therefore valid.[7]

Second, Plaintiffs argue that "even when a retention is expressly limited, the attorney may still have a duty to alert the client to legal problems which are reasonably apparent, even though they fall outside the scope of the retention."  *Nichols*, 15 Cal. App. 4th at 1684.  That much is true. But there are limits on an attorney's duty of care even where that duty exceeds the express bounds of a retainer agreement.  The California Court of Appeal in *Nichols* explained that "[t]he attorney need not advise and caution of every possible alternative, but only of those that may result in adverse consequences if not considered."  *Id.* at 1683–84.  And if the attorney opts "not [to] represent the client on such matters," the attorney "should inform the client of the limitations of the attorney's representation and of the possible need for other counsel."  *Id.* at 1684.  Moreover, that duty does not extend beyond the responsibility to inform the client about *legal* matters related to the representation to reach purely financial advice.  *See id.* ("[E]ven when a retention is expressly limited, the attorney may still have a duty to alert the client to *legal* problems which are reasonably apparent.") (emphasis added).

The record shows that Defendants did exactly what *Nichols* prescribed.  When he

---

[7] In this section of their brief, Plaintiffs also make the unexplained assertion: "There is little question that Defendants' [*sic*] assisted in the unauthorized practice of law."  Pl. Opp. at 17 n.16. Not only is this a non-sequitur, it is, like countless assertions throughout Plaintiffs' briefing, unsupported by any citations to relevant facts or legal authority.

discovered that Kim's direct interest in ALTe may have been converted into an indirect one, Lawler emailed Kim on October 15, 2014 warning him that the change may have adverse legal consequences for his EB-5 application—immigration advice within the scope of the retainer agreement. *See* Lawler Decl., Exh. C ("USCIS may challenge whether you have properly maintained your investment in ALTe as a direct investor. . . . It is unclear how this will affect you as a direct investor."). Lawler then clarified the limits of his representation and told Kim who to contact with questions about the *business* aspect of his investment. *See id.* ("As you know, I am only involved in the immigration visa matters, not the finance or business matters related to the Regional Center or it's [*sic*] projects. If you have any questions regarding the business aspects or job creation, I encourage you to contact Simon Ahn, the Principal of SMS Investment Group, LLC, or Darren Post, the CEO of ALTe Technologies, Inc."). On June 23, 2016, Lawler again wrote to Kim reiterating his concerns that the conversion of Kim's interest in ALTe could jeopardize Kim's pending I-829 petition. *See* Lawler Decl., Exh. D at 1 ("If you have failed to maintain your investment and interest in ALTe, and you are no longer serving in a management role with ALTe, your I-829 petition may be denied."). And again, Lawler explained the bounds of his representation and encouraged Kim to reach out to SMS or ALTe with any questions about the business aspects of his investment. *See id.* at 2.

Third, Plaintiffs contend that Defendants' conduct implied a broader scope of representation than the retainer agreements described. *See* Pl. Opp. at 17–18. As a result, Plaintiffs "formed an expectation that Defendants were retained to protect their financial interest and inform them of material information as it related to the project as a whole, including the investment." *Id.* at 18. Certainly, an attorney-client relationship can be implied, with its "existence and terms . . . manifested by conduct." *Zenith Ins. Co. v. O'Connor*, 148 Cal. App. 4th 998, 1010 (2007). But "California law is settled that a client's subjective belief that an attorney-client relationship exists, standing alone, cannot create such a relationship, or a duty of care owed by the attorney to that plaintiff." *Id.* And the evidence here evinces no conduct by Defendants that suggested their duties extended to financial or investment counseling. To begin with, Plaintiffs do not claim that Lawler ever told them that he would advise them about their EB-5

19

investments.  They further concede that they never asked Lawler about their investments in ALTe.  *See* Kim Deposition at 37:18–25 ("Q. Did you ever talk to Martin Lawler about any aspect of your decision to invest as a direct investor?  A. No, well, because I did not know what direct investment was.  Q. Did you talk to anybody other than Han-Maum before you made your investment in ALTe?  A. No."); Shim Deposition at 39:16–21 ("Q. Have you ever called Mr. Lawler to ask him about your investment?  A. No.  Q. Have you ever written to him to ask him about your investment?  A. No."); Xue Deposition at 14:14–16 ("Q. Have you – have you ever spoken with Mr. Lawler?  A. No.").  Nor did Lawler ever render legal advice regarding those investments.  *See* Lawler Decl. ¶ 38 ("I did not provide any business or finance advice of any kind.  I would not have opined about the viability of the investment even if I had been asked.").  In fact, Plaintiffs admitted at the hearing that they had all made the independent decision to invest in ALTe before ever retaining Defendants.  *See also* Kim Deposition at 37:23–25; Shim Deposition at 24:2–21; Xue Deposition at 22:2–12.  Defendants did not advise Plaintiffs in their selection of ATLe as their investment vehicle.

Plaintiffs insist that "through their role in GDRC and advertisement of their relevance and role in the ALTe Project, Defendants imputed themselves throughout the ALTe Project and marketed themselves in a manner to suggest that their duties toward Plaintiffs included oversight of the ALTe Project, foreign agents, and all business matters relevant to the performance of the investment."  Pl. Opp. at 17–18.  None of the evidence they reference supports that claim.  With respect to Defendants' role in GDRC, Lawler averred that he represented GDRC "[a]s immigration counsel only," to help GDRC secure USCIS approval as an EB-5 regional center.  Lawler Decl. ¶ 11; *id.* ¶ 12 ("I only prepared and filed immigration applications.").  "At no point was Mr. Lawler or his firm engaged in marketing investments through GRDC."  Ahn Decl. ¶ 8.  To show otherwise, Plaintiffs submit a screenshot from the GDRC website featuring Lawler's profile.  Hinton Decl., Exh. 18.  The profile identifies Lawler specifically as an "EB-5 Attorney" and describes him as "a California immigration law specialist."  Nothing on the website indicates that Lawler was representing himself as an attorney whose duties extended to "all business matters relevant to the performance of the investment," as Plaintiffs allege.

United States District Court
Northern District of California

With respect to ALTe, Lawler avers that he has "never provided any legal services to ALTe." Lawler Decl. ¶ 23. Ahn confirms that Lawler "did no marketing work related to investments in the ALTe company." Ahn Decl. ¶ 8. In attempting to refute that claim, Plaintiffs rely solely on an email exchange between Ahn and a Lawler & Lawler associate, which purportedly establishes that "Defendants drafted the Subscription Agreement [between Kim and ALTe] and structured Plaintiff Kim's direct investment." Pl. Opp. at 7. But that email shows nothing of the sort. Ahn emailed the Lawler associate asking, "Can you draft a sample Exhibit B or Amendment to ALTe Operating Agreement for ALTe to sign?" First Hinton Decl., Exh. 22. He states that the purpose of the amendment is to specify what Kim's ownership share in ALTe would be with his investment. *Id.* In response, the associate explains that it is *ALTe* that would have to make the amendment, not Lawler & Lawler: "Mr. Kim can become a new member as long as he agrees in writing to the Operating Agreement (para 3.4). So ALTe will have to provide that to him. ALTe will also need to amend Exhibit A to clarify how many units (measuring his membership interest) Mr. Kim gets." *Id.* Far from suggesting that Defendants held themselves out to be representatives of ALTe, this exchange reflects that Defendants had no involvement in ALTe.[8]

Finally, Plaintiffs argue that, even if the scope of Defendants' representation was circumscribed by the retainer agreement, it nonetheless covered Defendants' alleged malpractice. According to Plaintiffs, Defendants had a duty to inform them about any problems at ALTe because those problems could jeopardize their pending EB-5 applications—an immigration issue within the scope of the retainer agreement. It is true that job creation struggles at an EB-5 enterprise could impact an investor's application. *See* 8 C.F.R. § 216.6(c)(1)(iv) (providing that in adjudicating an investor's I -829 petition, USCIS "shall determine whether . . . . [t]he alien created or can be expected to create within a reasonable period of time ten full-time jobs to qualifying

---

[8] Elsewhere, Plaintiffs allege that "Defendants drafted the securities subscription agreement, clearly both a business and securities contract, at the behest of ALTe and Simon Ah[n] which was used to secure Plaintiff Kim's investment." Pl. Opp. at 11, 12. There is no citation to evidence supporting this allegation.

employees"). But it is undisputed that Defendants notified Plaintiffs of this very point. For example, Lawler's October 15, 2014 email reminded Kim that "[a]s a direct investor, ALTe must also show that your funds have created ten direct jobs," and informed him that "due to various business issues, ALTe has not been able to create the number of jobs they originally expected." Lawler Decl., Exh. C. The email voiced concern that, although "ALTe [wa]s working on several new business deals that they believe will create new jobs again," "[i]f insufficient jobs are created, or the direct jobs are allocated to another investor before you, there may not be enough jobs to allocate to you." *Id.* Lawler concluded the email by reiterating that he is "only involved in the immigration visa matters, not the finance or business matters." *Id.* He offered to have a follow-up call with Kim to discuss "the immigration implications" of the news, and directed Kim to contact Ahn and ALTe with "any questions regarding the business aspects or job creation." *Id.* Defendants provided similar information to Shim. *See* First Hinton Decl., Exh. 20 at 4. (By this point, Xue had retained other counsel to pursue her EB-5 application. *See* Lawler Decl. ¶ 29.) Defendants thus discharged any duty they had under the retainer agreement to advise Plaintiffs about the immigration implications of the job creation issues at ALTe. Nothing in the record supports expansion of that duty to providing purely financial advice.

In sum, the evidence demonstrates that Defendants fully advised Plaintiffs about the immigration matters that Defendants were retained to handle, and that their duty of professional care to Plaintiffs did not extend to rendering business or investment advice. Because Plaintiffs have not established a genuine dispute as to the duty element of their legal malpractice claim, Defendants' motion for summary judgment on the claim is **GRANTED**. *See River City*, 960 F.2d at 1462 (the summary judgment standard "requires the movant to affirmatively demonstrate that there is no genuine dispute as to every essential element of its claim").

### b. Causation

In addition to failing to establish a triable issue of fact with respect to duty, Shim has not shown that "the loss [she] suffered was in fact caused by the alleged attorney malpractice." *Viner v. Sweet*, 30 Cal. 4th 1232, 1240–41 (2003) (emphasis removed) (citation omitted). "[A] plaintiff in a transactional malpractice action must show that *but for* the alleged malpractice, it is more

22

likely than not that the plaintiff would have obtained a more favorable result." *Id.* at 1244 (emphasis in original). Under this causation standard, it is not enough for the plaintiff to simply claim that it was possible to obtain a better result absent the attorney misconduct. *Namikas v. Miller*, 225 Cal. App. 4th 1574, 1582 (2014). "[T]he plaintiff must show that he would *certainly* have received" a better result. *Id.* (alteration and internal quotation marks omitted) (emphasis in original).

Here, Plaintiffs claim that Defendant's failure to alert Plaintiffs to any concerns about the status of their ALTe investments precluded Plaintiffs from mitigating their losses by, for example, withdrawing their investments. Assuming *arguendo* that Defendants had a professional duty to help Plaintiffs mitigate their investment losses, there is no evidence that Shim would have opted to protect her investment by withdrawing it from ALTe if doing so meant terminating her EB-5 application.[9] When the Court gave Plaintiffs an opportunity after the hearing to identify evidence in the record that they would have given up their pursuit of green cards to preserve their investments, Shim was unable to provide a responsive cite.[10] She could only represent that she "will ultimately testify that she would never had [*sic*] made the investment in ALTe or maintained it, regardless of the impact to her petition, had she known the truth regarding ALTe." Docket No. 83 at 4.

Shim's legal malpractice claim therefore fails for the additional reason that she has not established a genuine issue as to causation.

### 2. Breach of Fiduciary Duty

Plaintiffs' opposition to Defendants' motion for summary judgment on the breach of fiduciary claim contains scattershot allegations of different kinds of improper conduct largely

---

[9] At the hearing, Plaintiffs acknowledged that they would not have been able to obtain green cards if they had ended their EB-5 investments.

[10] In contrast, Kim and Xue gave at least some indication in their depositions that they would not have pursued their investments in ALTe if they had been aware of the associated financial risks. *See* Kim Deposition at 37:4–6 ("I would not have made the investment if I knew that there was a risk associated with direct investment."); Xue Deposition at 103:15–25 ("So what I said in the text message [to Xue's migration agent] is that right now the most important thing is no more green card, but money needs to be returned.").

23

devoid of citations to evidence. *See* Pl. Opp. at 19–21. The vague, unsubstantiated nature of Plaintiffs' argument is best reflected in their bare assertion that "Defendants breached far too many fiduciary duties to sufficiently set forth herein." *Id.* at 20. The gravamen of Plaintiffs' claim appears to be that Defendants were mired in a conflict of interest between their concurrent representation of Plaintiffs and of Ahn, GDRC, and SMS. *See id.* (asserting that Defendants "failed to perform with due diligence, advised clients in violation of the law, [and] engaged in adverse business interests while representing Plaintiffs.").

To state a claim for breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991). "Breach of fiduciary duty is a concept that is 'separate and distinct from traditional professional negligence but which still comprises legal malpractice.'" *Wolk v. Green*, 516 F. Supp. 2d 1121, 1130 (N.D. Cal. 2007) (quoting *Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal. App. 4th 1022, 1044 (1998)). "Though the scope of the duty is ordinarily a question of law, breach is ordinarily a question of fact reserved for the jury." *Knight v. Aqui*, 966 F. Supp. 2d 989, 996 (N.D. Cal. 2013).

a. <u>Duty and Breach</u>

"[T]he Rules of Professional Conduct . . . together with statutes and general principles relating to other fiduciary relationships, 'help define the duty component of the fiduciary duty which an attorney owes to his client.'" *Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1032 (2002) (quoting *Mirabito v. Liccardo*, 4 Cal. App. 4th 41, 45 (1992)). There is no dispute here that Defendants had an attorney-client relationship with each Plaintiff, and therefore were in a fiduciary relationship with each Plaintiff. *See Nichols*, 15 Cal. App. 4th at 1684. There is likewise no dispute that the California Rules of Professional Conduct ("RPC") require attorneys to avoid conflicts in interest in representing clients. Specifically, RPC 3-310(C)(3)[11] provides that an attorney "shall not, without the informed written consent of each client . . . . [r]epresent a client in a matter and at the same time in a separate matter accept as a

---

[11] The RPC were amended and renumbered effective November 1, 2018. The RPC references here are to the former version of the rules, which were effective at the time of the alleged conduct.

client a person or entity whose interest in the first matter is adverse to the client in the first

matter."

Plaintiffs contend that Defendants violated RPC 3-310(C)(3) by concurrently representing

Plaintiffs and Ahn, GDRC, and SMS without obtaining each party's informed written consent.[12]

Defendants counter that they fully complied with Rule 3-310(C)(3) by providing each Plaintiff

with a waiver explaining the potential conflict of interest with Ahn, GDRC, and SMS and

obtaining Plaintiffs' consent to the joint representation.  The waiver explained:

> For EB-5 immigrant employment-based permanent residence,
> Lawler & Lawler represents both the Green Detroit Regional Center
> and Ahn & Associates and SMS Investment Group, LLC (referred
> hereafter to as the Green Detroit Regional Center), and the Investor
> in securing an immigrant visas for the Investor. In the case of a
> conflict of interest, Lawler & Lawler may have professional duties
> under attorney Rules of Professional Conduct that require
> withdrawal from representation of one or both of the clients. We do
> not see any conflicts of interest in this joint representation, but we
> do want you to understand the ramifications of our representing both
> the Green Detroit Regional Center and an Investor in visa matters.

Roeca Decl., Exh. D.

Plaintiffs argue that the waiver is inadequate because it is a "general boilerplate waiver"

that failed to explain the conflict and how it could impact Defendants' representation.  Pl. Opp. at

20 n.19.  For this proposition, Plaintiffs cite *Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285 (1995)

and *People v. Baylis*, 139 Cal. App. 4th 1054 (2006).  In *Zador*, the California Court of Appeal

found a conflict waiver "detailed" and adequate.  31 Cal. App. 4th at 1300–01.  The waiver

informed the client that there was no current conflict of interest with the law firm's representation

of the client and his co-defendants, but that a conflict may develop in the future; if a conflict arose

the firm would apprise the client promptly to allow him to decide whether to retain independent

---

[12] Plaintiffs also claim that Defendants were attorneys to ALTe.  There is no evidence to substantiate this claim.  Lawler avers that Defendants "have never provided any legal services to ALTe." *Id.* ¶ 23.  Plaintiffs disagree, citing Exhibit 22 to the First Hinton Declaration as proof that "Defendants drafted the Subscription Agreement [between Kim and ALTe]."  Pl. Opp. at 7.  However, as explained previously, Exhibit 22 is an email exchange in which a Lawler & Lawler associate informs Ahn that Defendants are *not* able to amend a contract on ALTe's behalf.  *See* First Hinton Decl., Exh. 22 ("*ALTe* will also need to amend Exhibit A to clarify how many units . . . Mr. Kim gets.") (emphasis added).

counsel; joint representation may result in divided attorney-client loyalties; and in the event of a conflict, the firm may withdraw or be disqualified from its representation of the client. *Id.* at 1289–90. In contrast, the conflict waiver in *Baylis* was held to be "inadequate." That waiver simply stated, in its entirety, that "I have been advised that a conflict of interest may exist with Mr. Hove representing Patrick Baylis. I am aware of this and herby [sic] waive any conflict of interest regarding same." 139 Cal. App. 4th at 1068 (alteration in original). The court criticized this language for "reflect[ing] no awareness of the nature and seriousness of the conflict involved." *Id.*

The waiver Defendants provided in this case is akin to the one approved in *Zador* and significantly more detailed than the one rejected in *Baylis*. The waiver alerted Plaintiffs of Defendants' belief that there was no existing conflict between their representation of Plaintiffs and Ahn, GDRC, and SMS, but that if a conflict arose Defendants would withdraw or be disqualified; that the client could consult separate counsel; and gave examples of potential adverse interests between the respective clients. Roeca Decl., Exh. D. The waiver is not inadequate as a matter of law.

There is more merit to Plaintiffs' contention that a genuine issue of fact exists as to whether Plaintiffs signed the waivers knowingly and intelligently. To begin with, the waiver in the record that Defendants purportedly sent to Shim is blank—no party has dated or signed it. *See id.*, Exh. N. In Shim's deposition, the parties refer to a version of the waiver that Shim authorized his migration agent to sign on his behalf, although he states that the contents of the waiver were not fully explained to him. *See* Shim Deposition at 50:5–51:1. The waiver purportedly sent to Xue is undated and bears a signature appearing to be Xue's, but is not signed by GDRC. *See* Roeca Decl., Exh. T. Xue stated in her deposition that her migration agent told her to sign the waiver without explaining its contents to her. Xue Deposition at 56:11–57:15. And as to Kim, although his waiver is signed by both parties, he similarly stated in his deposition that he was simply told to sign it by his migration agent without being informed about its contents. *See* Roeca Decl., Exh. D; Kim Deposition at 38:15–39:5.

As California courts have emphasized, "[w]here a defendant seeks to waive his counsel's conflict of interest, the waiver must be a knowing and intelligent act 'done with sufficient

awareness of the relevant circumstances and likely consequences.'" *Baylis*, 139 Cal. App. 4th at 1067 (quoting *People v. Mroczko*, 35 Cal. 3d 86, 109–110 (1983)). Thus, a proper waiver requires that "(1) the [client] has discussed the potential drawbacks of joint representation with his attorney or outside counsel, (2) the [client] has been made aware of the dangers and possible consequences of joint representation in the case, (3) the [client] knows of his right to conflict-free representation, and (4) the [client] voluntarily wishes to waive that right. *Id.* at 1068. Given Plaintiffs' testimony that the contents of the waiver was not fully explained to them, there is a genuine issue of fact as to whether their waivers were "informed" within the meaning of RPC 3-310(C)(3).

### b. Causation

Even if Defendants breached their fiduciary duty to Plaintiffs by failing to obtain a valid waiver, however, Plaintiffs have failed to show that they suffered "damage proximately caused by the breach." *Pierce*, 1 Cal. App. 4th at 1101.

It is undisputed that any conflict between Defendants' representation of Plaintiffs and of Ahn, GDRC, and SMS did not harm Plaintiffs' EB-5 applications; they all successfully obtained LPR status. There is also no evidence that the conflict caused any financial losses to Plaintiffs. As noted previously, Plaintiffs admit that they had each decided to invest in ALTe before they retained Defendants. Accordingly, Defendants cannot blamed for inducing Plaintiffs' investments at the outset. Nor is there evidence that Defendants, whether conflicted or not, later withheld information about ALTe's struggles from Plaintiffs. Plaintiffs allege that Defendants became aware of problems at ALTe before October 2014, when Defendants first relayed news the problems to Plaintiffs. In particular, Plaintiffs believe that Defendants knew ALTe did not in fact secure a $100 million loan from the Department of Energy or $240 million in purchase orders from customers as GDRC's promotional materials promised. But the evidence does not substantiate Plaintiffs' allegations. Plaintiffs rely on a portion of Ahn's deposition in which he recalls that GDRC sometimes provided Defendants with ALTe's "tax returns" and "bank statements" for inclusion in EB-5 applications Defendants were preparing for their clients. Ahn Deposition at 40:12–41:22. These vague references to financial documents fall far short of showing that Defendants were privy to the news about ALTe's loan applications or purchase

27

orders. Moreover, the evidence shows that soon after learning of the financial problems at ALTe, Lawler informed Plaintiffs of the potential implications to their EB-5 applications. *See* Lawler Decl., Exh. C. There is nothing in the record suggesting Lawler delayed in giving such notice. *See* Section II.C.3.b., *infra* (addressing Plaintiffs' failure to show that Defendants were aware of ALTe's struggles prior to October 2014).

Relatedly, Plaintiffs complain that before Defendants finally sent the October 15, 2014 email informing Plaintiffs about the issues at ALTe, Lawler first "provided a draft of the notification to Mr. Ahn." First Hinton Decl., Exh. 20 at 4. Plaintiffs believe that this advance notice to Ahn exemplified the conflicted nature of Defendants' representation. Again, however, Plaintiffs are unable to articulate how this offense caused them harm. For example, they do not claim that Defendants omitted any material information from the email to investors at Ahn's request. To the contrary, Lawler made clear in the email that it was GDRC that first alerted him to the adverse information about ALTe. *See* Lawler Decl., Exh. C.

Because Plaintiffs have failed to establish that Defendants' alleged conflict caused them harm, Defendants' motion for summary judgment is **GRANTED** with respect to the breach of fiduciary duty claim.

3. <u>Fraud, Deceit, Negligent Misrepresentation, and Fraudulent Concealment</u>

Plaintiffs' third, fourth, fifth, and seventh causes of action are for fraud, fraudulent concealment, deceit, and negligent misrepresentation. Compl. ¶¶ 67–72, 73–79, 80–85, 93–96. The fraud, deceit, and negligent misrepresentation claims are based on the affirmative misrepresentations Defendants allegedly made to prospective investors about ALTe. *See* Pl. Opp. at 22. In addition, the fraud, deceit, and fraudulent concealment claim are based on Defendants' alleged ongoing concealment or nondisclosure of information regarding ALTe's precarious health. *See id.*

a. <u>Affirmative Misrepresentations</u>

The elements of fraud that give rise to a tort action for deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c)

intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage.[13] *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997). "The elements of negligent misrepresentation are similar to intentional fraud except for the requirement of scienter; in a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true." *Charnay v. Cobert*, 145 Cal. App. 4th 170, 184 (2006)

Defendants are entitled to summary judgment on Plaintiffs' affirmative misrepresentation claims because Plaintiffs have not adduced any evidence that Defendants made the alleged misrepresentations. Plaintiffs concede that they never spoke to Lawler about their decisions to invest in ALTe. *See* Kim Deposition at 37:18–25 ("Q. Did you ever talk to Martin Lawler about any aspect of your decision to invest as a direct investor? A. No, well, because I did not know what direct investment was. Q. Did you talk to anybody other than Han-Maum before you made your investment in ALTe? A. No."); Shim Deposition at 39:16–21 ("Q. Have you ever called Mr. Lawler to ask him about your investment? A. No. Q. Have you ever written to him to ask him about your investment? A. No."); Xue Deposition at 14:14–16 ("Q. Have you – have you ever spoken with Mr. Lawler? A. No."). Plaintiffs conceded at the hearing that they had each already invested in ALTe or made the decision to invest in ALTe by the time they retained Defendants.

Plaintiffs cite no evidence to contradict Defendants' averments that they "did not provide any business or finance advice of any kind" and "would not have opined about the viability of the [ALTe] investment even if [they] had been asked." Lawler Decl. ¶ 38. Plaintiffs reference a GDRC document distributed to potential investors that claimed "Orders of 240,000,000 US dollars' value already received [by ALTe]." First Hinton Decl., Exh. 10 at 1–5. But this document was created by GDRC, not Defendants. And although Defendants were retained by GDRC, Lawler makes clear that his firm represented GDRC and Ahn "[a]s immigration counsel

---

[13] Plaintiffs assert claims for common law fraud and deceit as well as under California Civil Code §§ 1709 and 1710, which codify the common law actions for fraud and deceit, and require proof of the same elements. *See Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 172 (2003); *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

only." Lawler Decl. ¶ 11. Ahn confirms that "[a]t no point was Mr. Lawler or his firm engaged in marketing investments through GDRC." Ahn Decl. ¶ 8. There is thus no evidence that Defendants were responsible for GDRC's marketing materials.

Attempting to show otherwise, Plaintiffs submit a screenshot from a page on GDRC website titled "Our Team," which features Lawler's profile. Hinton Decl., Exh. 18. The profile identifies Lawler specifically as an "EB-5 Attorney" and describes him as "a California immigration law specialist." This is entirely consistent with Lawler and Ahn's description of Lawler's role as strictly limited to immigration issues. Plaintiffs also cite to a portion of Lawler's deposition wherein he purportedly admitted to being involved in GDRC's marketing efforts. Plaintiffs' characterization is belied by the transcript; in the cited exchange Lawler states quite clearly that he was only engaged in "[i]mmigration legal services" for GDRC. Lawler Deposition at 85:8–19 ("Q. If you don't mind describing, what was the nature of the legal services that you provided to Mr. Ahn? A. Immigration legal services. Q. What type? A. We assisted the Green Detroit Regional Center, SMS, Mr. Ahn in obtaining a regional center designation for the Green Detroit Regional Center. We filed some annual reports. We gathered up documents to present regarding his projects with the 924 applications and also for the investors, 526 applications.").

Because there is no evidence that the alleged misrepresentations about ALTe's business prospects were made by Defendants, Plaintiffs have failed to show a genuine dispute as to an essential element of their claims. *River City*, 960 F.2d at 1462. Accordingly, Defendants' motion is **GRANTED** with respect to Plaintiffs' fraud, deceit, and negligent misrepresentation claims to the extent they are based on affirmative misrepresentations.

b.    Concealment and Nondisclosure

In addition to affirmative misrepresentations, fraud encompasses "[t]he suppression of a fact, by one who is bound to disclose it." *Knutson v. Foster*, 25 Cal. App. 5th 1075, 1091 (2018) (quoting Cal. Civ. Code, § 1710(3)) (alteration in original). "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud

the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Id.* (citation omitted).

Plaintiffs argue that by virtue of Defendants' relationship with Ahn, GDRC, and SMS, Defendants were positioned to have learned of material facts regarding ALTe's financial condition that they had a duty to disclose to Plaintiffs. Pl. Opp. at 22. Plaintiffs' briefing on this issue is barebones and devoid of any evidentiary citation. *See id.* Even if it is assumed that Defendants had a duty of professional care to notify Plaintiffs about material facts relating to the ongoing viability of their ALTe investments (a proposition negated in the analysis above), Plaintiffs have failed to raise a triable issue of fact as to two elements of their claim. First, the evidence does not support the inference that Defendants were aware of ALTe's struggles prior to October 2014 such that they could have concealed any adverse information. While Ahn recounts that GDRC provided Defendants with "[f]inancial and business updates" about ALTe between 2010 and 2015 to include in their clients' EB-5 applications, he describes these updates as consisting of "tax returns" and "bank statements." Ahn Deposition at 40:12–41:22. There is no indication that Defendants could have discerned from these documents that ALTe's initial claims about purchase orders already received or loans provided by the Department of Energy were false.

Second, Plaintiffs have not cited any evidentiary basis to support the inference that Defendants withheld information about ALTe with an intent to defraud Plaintiffs. To be sure, "[d]etermining . . . intent is a highly fact-specific inquiry" that is "not generally suitable for disposition on summary judgment." *Fanucchi & Limi Farms v. United Agri Prod.*, 414 F.3d 1075, 1082 (9th Cir. 2005) (citing *Hunt v. Smyth*, 25 Cal. App. 3d 807, 818 (1972); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1060 (9th Cir. 2000)). Nevertheless, "[w]hen opposing a motion for summary judgment, 'the plaintiff must present significant probative evidence relevant to the issue of intent . . . ; mere conclusory allegations are insufficient to require that the motion for summary judgment be denied.'" *Simpson v. Allstate Ins.*, No. C-99-02940-CRB, 2000 WL 1006533, at *3 (N.D. Cal. July 10, 2000) (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980)). Plaintiffs' failure to marshal any evidence of Defendants' intent to defraud and

31

concealment of financial information about ALTe dooms their fraudulent concealment claims.

Accordingly, Defendants' motion is **GRANTED** as to Plaintiffs' fraudulent concealment claims.

### 4.    Unfair Business Practices

Plaintiffs' ninth cause of action is brought under California's Unfair Competition Law ("UCL"). Plaintiffs allege that Defendants engaged in unlawful and unfair business practices under the UCL by "enter[ing] into an agreement, or engag[ing] in a practice, with [GDRC] whereby Defendants would serve as the exclusive counsel to investors in ALTe, and whereby [GDRC] would funnel ALTe investors . . . to Defendants as exclusive counsel." Compl. ¶ 104. An "unlawful" practice under the UCL is "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotation marks omitted). The "unfair" prong of the UCL creates a cause of action for a business practice that is unfair even if not proscribed by some other law. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003).

The only authority Plaintiffs cite for the proposition that the kind of exclusivity arrangement they allege between Defendants and GDRC violates the UCL is *Saunders v. Superior Court*, 27 Cal. App. 4th 832 (1994). In *Saunders*, one group of certified shorthand reporters sued another group of certified shorthand reporters and certain insurance companies for a practice known as "direct contracting." *Id.* at 837. Pursuant to this practice, the defendant reporters contracted with the defendant insurance companies for the exclusive right to report depositions taken by those companies' lawyers; any lawyers that used the services of other reporters would not be reimbursed by the companies. *Id.* at 838. Furthermore, the reporters agreed to "offer training to the insurance carrier defendants and their employees," and to "review and comment upon . . . the performance of the lawyers" in order to "assist insurance companies to evaluate the need for replacement counsel." *Id.* at 839. The plaintiff reporters argued that this arrangement was unlawful and unfair under the UCL, and the *Saunders* court held that their claim was sufficiently pleaded to survive a motion to dismiss. *Id.* at 840.

*Saunders*, however, is inapplicable to the facts of this case because it did not hold that

32

every exclusivity arrangement violates the UCL. In fact, the court noted that the plaintiff reporters "d[id] not contend direct contracting is illegal per se." *Id.* at 838. Rather, it was the *form* of direct contracting "as practiced by defendants," which "compromise[d] the impartiality" of the defendant reporters, that was problematic. *Id.* at 838–39. By statute, certified shorthand reporters cannot engage in "acts contrary to professional standards concerning . . . impartiality." Cal. Bus. & Prof. Code § 8025(d). The *Saunders* court expressed its concern that, under the contract between defendant reporters and defendant insurance companies,

> the reporter at a deposition may be wearing as many as five hats. He or she may be not only reporting the deposition but also may be the trainer of the attorney taking the deposition and the insurance company employees preparing for the deposition. In addition to reporting and transcribing the deposition, the reporter will also be providing a review and commentary on the substance of the sworn testimony, critiquing the performance of the attorney taking the deposition and evaluating for the insurer the need to replace this attorney.

*Id.* at 840. The court thus concluded that it "cannot say, as a matter of law, a reporter who at the same time acts as trainer, commentator, critiquer and evaluator for one party as to the deposition he or she is reporting has not violated professional standards of impartiality." *Id.*

All that Plaintiffs have alleged here is that there was an exclusivity arrangement between Defendants and GDRC, but they do not assert that the arrangement imposed on Defendants contractual roles that violated a duty of impartiality, as in *Saunders*. Otherwise, Plaintiffs provide no authority to support their claim that the alleged exclusivity arrangement violates the UCL. Accordingly, Defendants' motion is **GRANTED** as to Plaintiffs' UCL claim.

5.    <u>Securities Violations under California Corporations Code § 25504</u>

Plaintiffs' sixth cause of action alleges that Defendants violated § 25504 of the California Corporations Code. Compl. ¶¶ 86–92. Section 25504 allows liability to be imposed on secondary actors where a primary actor "offer[s] or sell[s] a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact." Cal. Corp. Code §§ 25401, 25504; *see Chassin Holdings Corp. v. Formula VC Ltd.*, No. 15-CV-02294-EMC, 2017 WL 66873, at *9 (N.D. Cal. Jan. 6, 2017).

The complaint alleges that Defendants are liable under § 25504 for the misrepresentations

made by GDRC and ALTe to EB-5 investors. To establish § 25504 liability, a plaintiff must show that the secondary actor "materially aid[ed] in the act or transaction constituting the [underlying securities] violation." Cal. Corp. Code § 25504. As detailed in Section II.C.3., *supra*, Defendants have put forth evidence that they were not involved in producing or disseminating the marketing materials about ALTe. Plaintiffs' opposition brief offers no response. Indeed, Plaintiffs neglect to address Defendants' motion for summary judgment on the § 25504 claim altogether.

Defendants' motion is therefore **GRANTED** as to Plaintiffs' § 25504 claim.

### 6.   Civil Conspiracy

Plaintiffs' eighth cause of action alleges that Defendants formed a civil conspiracy with non-parties Ahn, GDRC, and ALTe to induce EB-5 applicants to make investments in ALTe at inflated prices. Compl. ¶¶ 97–101. "The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994).

Again, Plaintiffs do not substantively respond to Defendants' motion for summary judgment on the civil conspiracy claim. Plaintiffs only recite the elements of civil conspiracy, accompanied by the completely unsubstantiated assertion that "Plaintiffs can demonstrate that Defendants conspired with Simon Ah[n], GDRC and 'immigration agencies' to effectuate the sale of securities through misrepresentations and omissions." Pl. Opp. at 23. Plaintiffs cannot avoid summary judgment by promising that they "can" establish a claim at some unspecified future point.

Given the lack of any cited evidence supporting Plaintiffs' civil conspiracy claim, Defendants' motion for summary judgment on the claim is **GRANTED**.

### 7.   Unjust Enrichment

Plaintiffs' tenth and final cause of action alleges that Defendants were unjustly enriched as a result of inducing Plaintiffs to invest in ALTe. Compl. ¶¶ 108–13. "The elements of an unjust enrichment claim are the 'receipt of a benefit and [the] unjust retention of the benefit at the expense of another.'" *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008) (alteration

in original) (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)). An unjust enrichment claim does not lie where "plaintiffs received the benefit of the bargain." *Id.*

Here, Defendants have presented evidence that Plaintiffs paid Defendants "to perform the legal work to obtain an EB-5 visa." Lawler Decl. ¶ 18. And it is undisputed that each Plaintiff was successful in obtaining an EB-5 visa and, ultimately, LPR status. Defendants further aver that they "did not receive a referral fee, finder's fee, commission, or other compensation from KIDC, GDRC, SMS, ALTe, or anyone else in relation to plaintiffs' investments in ALTe." *Id.* ¶ 22. Plaintiffs have not cited any evidence to contradict Defendants' claim that Plaintiffs received the benefit of the bargain of their contract with Defendants; they obtained legal counsel in respect to obtaining an EB-5 visa and LPR status. In its entirety, Plaintiffs' response regarding the unjust enrichment issue states: "For the reasons set for herein, there are genuine questions of material fact that preclude granting summary judgment for Defendants." Pl. Opp. at 26. Plaintiffs offer no evidence or even argument in opposition to Defendants' evidentiary showing.

Accordingly, Defendants' motion is **GRANTED** as to the unjust enrichment claim.

D.    Plaintiff Kim's Motion for Partial Summary Judgment

Plaintiff Kim moves for partial summary judgment on his two interrelated claims for legal malpractice and breach of fiduciary duty.[14] Pl. Mot. at 1. Kim argues that Defendants breached their duty of profession care and fiduciary duty by failing to keep him apprised of the status of his investment in ALTe and to timely notify him that his direct interest in ALTe was converted to an indirect interest via SMS.

Kim's claim fails for the same reasons that Defendants are entitled to summary judgment on the legal malpractice claim—Defendants kept Kim fully informed about the aspects of his investment that pertained to his EB-5 application, and otherwise owed no duty advise him about business or investment matters.[15] As noted above, the retainer agreement and Defendants'

---

[14] Plaintiffs styled the motion as a motion for summary judgment, but acknowledge in their reply brief that it is a motion for partial summary judgment on the legal malpractice and breach of fiduciary duty claims. Docket No. 78 at 1 n.1.

[15] For instance, Defendants had no duty to advise Kim that the conversion of his interest in ALTe

35

conduct reflect that Defendants "only provide[d] services for [Kim's] EB-5 visa.," and "provide[d] no business advice" or "recommendations for a business investment from an economic viewpoint." Roeca Decl., Exh. C.  At no point did Kim ask Defendants for business or investment advice.  *See* Kim Deposition at 37:18–25.  When Defendants discovered that Kim's direct stake in ALTe had apparently been converted to an indirect stake, Lawler promptly notified Kim that such a change could jeopardize his EB-5 application.  *See* Lawler Decl., Exh. C (Lawler's October 15, 2014 email to Kim stating that "SMS recently notified me just prior to filing your I-829 petition that your ownership interest has been transferred from ALTe to SMS . . . .  USCIS may challenge whether you have properly maintained your investment in ALTe as a direct investor. . . ."); *see also id.*, Exh. D (Lawler's June 23, 2016 letter to Kim reiterating that "I am unclear if you still hold an ownership interest in ALTe for your direct investment. . . .  If you have failed to maintain your investment and interest in ALTe, and you are no longer serving in a management role with ALTe, your I-829 petition may be denied.").  In his communications with Kim, Lawler repeatedly emphasized that he was "only involved in the immigration visa matters, not the finance or business matters related to the Regional Center or it's [*sic*] projects," and encouraged Kim to contact Ahn or ALTe with "any questions regarding the business aspects or job creation." *Id.*, Exh. C; *id.*, Exh. D ("I am only involved in the immigration visa matters, not the finance or business matters related to the Regional Center of its projects.").

Kim faults Defendants for not alerting him to the conversion of his ALTe interest sooner, but is unable to produce any evidence that shows Defendants were aware of the conversion prior to October 2014.  Lawler's October 15, 2014 email stated that he was only "recently notified" of the conversion.  *Id.*, Exh. C.  Nevertheless, Kim insists that "it is undisputed that Defendants obtained knowledge of the conversion in May 2014," citing an email sent by a Lawler & Lawler attorney on May 7, 2014.  Pl. Mot. at 7 n.5.  Far from revealing that Defendants knew about the conversion, the email shows that Defendants were still working under the assumption that Kim had a direct investment in ALTe.  *See* First Hinton Decl., Exh. 24 ("Since Mr. Kim is a direct

---

may have entitled him to request the return of his investment under the terms of the subscription contract between Kim and ALTe.  *See* Pl. Mot. at 10.

1    investor in ALTe, we need to show the maintenance of his investment in ALTe."). Kim also cites

2    another email that Ahn sent to Defendants on April 21, 2014 . All that email says is that "Mr. Kim

3    has not served on the Board at ALTe lately"; nowhere does it inform Defendants that Kim had lost

4    his direct interest in the company. Third Hinton Decl., Exh. 11.

5         In light of Kim's failure to establish that Defendants owed him a duty to advise him on

6    business and investment matters, his motion for partial summary judgment is **DENIED**.

7                              **III.**     <u>**CONCLUSION**</u>

8         Defendants' motion for summary judgment is **GRANTED**. Plaintiffs' motion for partial

9    summary judgment and motion to strike are both **DENIED**. The Clerk of the Court is instructed

10   to enter judgment in favor of the Defendants and close this case.

11        This order disposes of Docket Nos. 61, 62, and 89.

12

13        **IT IS SO ORDERED**.

14

15   Dated: July 9, 2019

16

17   _____

18   EDWARD M. CHEN
     United States District Judge

19

20

21

22

23

24

25

26

27

28